

# THE ATTORNEY GENERAL
## OF TEXAS
### AUSTIN 11, TEXAS

GROVER SELLERS
~~WILL WILSON~~
ATTORNEY GENERAL

Hon. J. P. Gibbs
Casualty Insurance Commissioner
Board of Insurance Commissioners
State Office Building
Austin 14, Texas

Dear Sir:

Opinion No. O-5873
Re: Control by Board of Insurance
Commissioners over workman's
compensation rates and spe-
cific questions answered in
relation thereto.

In your letter addressed to Honorable Grover Sellers, Attorney
General, under date of February 15, 1944, you submit twenty-two
separately numbered questions you desire answered by an opinion of
this department. The submission of such questions grow out of a
publicized notice issued relative to a public hearing held by the
Board of Insurance Commissioners in Austin, Texas, on November 19,
1943, at which time the Insurance Carriers were informed that the
Board had under consideration the following matters, quoted herein
from said notice:

> "It has come to the attention of the Board that various plans
> and agreements, both written and oral, are being used by a
> number of insurance carriers in the writing of workmen's com-
> pensation insurance, which plans and agreements are not writ-
> ten into the application and policy. It is the opinion of
> the Board that under the express terms of Article 4913, such
> agreements or contracts are void and of no effect and in
> violation of the provisions of the law. All interested in-
> surers, regardless of type or plan of operation, and insureds
> are hereby invited to give definite and good reasons, if
> there by any, why the Board should not:
>
> > (a) Prohibit premium surcharge waiver agreements under
> > retrospective rating plans or prescribe a premium
> > waiver table.
> >
> > (b) Prohibit so-called "cost-plus" plans.
> >
> > (c) Prohibit so-called "stop-loss" plans.

(d) Require participating companies to file plan of
    operation and seals of proposed dividends to be
    approved by the Casualty Insurance Commissioner in
    the form of an endorsement to be attached to each
    and every policy written by such carrier.

(e) Prohibit the use of any plan, contract, agreement or
    resolution not specifically prescribed or authorized
    by the Board."

As pointed out in your letter, the Board contemplated taking such
action under its authority to make rules and regulations con-
sidered by it necessary and proper to establish control over the
rates promulgated by it under statutory authority.

Further in connection with your request, you submit certain facts
pertaining to the practices and methods of various insurance
carriers writing workmen's compensation insurance in this State
in the form of exhibits and other data relating to grouping of
insureds, payment of dividends and certain agreements entered in-
to between these carriers and particular insureds. In addition
you call our attention to eight former opinions heretofore ren-
dered by the Attorney General's Office at various times during
the period from December 18, 1926, to April 20, 1940, answering
certain questions. The foregoing data has received our careful
consideration. Such answers we may give to the questions in-
dividually must be considered in the light of the authorities in-
corporated herein as applicable to the power and authority of the
Board expressly given in Art. 4915, R.C.S. of Texas, which reads:

"The Commission (Board) is hereby empowered to make and en-
force all such reasonable rules and regulations not incon-
sistent with the provisions of this law as are necessary
to carry out its provisions."

The matter of payment of premiums by the subscriber or the cor-
rectness of the applicable premium rate payable is one solely be-
tween the insurer and the insured, once the contract is entered
into and with which the Board of Insurance Commissioners is not
concerned, having fixed and promulgated the rate under the author-
ity of the statutes. Nor is any question herein considered in-
terpreted as affecting the reasonableness or adequacy of any par-
ticular rate schedule promulgated under the Board's rate making
power, it being clear that the questions deal not with "control"
as might be applicable to the reasonableness or adequacy of the
rates applicable to all classifications of hazards but solely to
indirect control as by contract and side agreements with insureds,
such rates fixed and promulgated by the Board and accepted by the
insurers on the face of the policies, are abrogated and modified,
usually by endorsements or other means, having heretofore, in

some instances, the approval of the Board.  Assuming, therefore,
the proper exercise of the Board's power in fixing rates of pre-
mium applicable to the various classifications of hazards and
the classes to which they apply as well as being adequate to the
risks, we will endeavor to discuss the power and authority of the
Board in the light of our interpretation and construction of the
statutes.

The material statutes, vesting in the Board of Insurance Commis-
sioners power and authority to classify hazards, promulgate pre-
mium rates, and prescribe standard and uniform policy contract
forms, deemed necessary to cite, read:

> "Art. 4907, R.C.S. 1925.
> "The said Commission (Board) shall make, establish and promul-
> gate all classifications of hazards and rates of premiums res-
> pectively applicable to each, contemplated and provided for
> by Title 130, known as the Workmen's Compensation Law and/or
> by the"Longshoremen's and Harbor Workers' Compensation Act"
> as enacted by the Congress of the United States.  Said Com-
> mission shall publish all rates promulgated by it as affect-
> ing Compensation Insurance in this State, and said rates, or
> any change therein, shall be published fifteen days before
> they become effective and in force.  Acts 1923, p. 408; Acts
> 1931, 42nd Leg., p. 290, ch. 171 1."

> "Art. 4908. The Commission (Board) shall prescribe standard
> policy forms to be used by all companies or associations
> writing workmen's compensation insurance in this State.  No
> company or association authorized to write workmen's compen-
> sation insurance in this State shall, except as hereinafter
> provided for, use any classifications of hazards, rates of
> premium, or policy  forms other than those made, established
> and promulgated and prescribed by the Commission.  Acts 1923,
> p. 408."

> "Art. 4909. The Commission (Board) shall assemble all neces-
> sary data for its use in establishing classifications of
> hazards and making and promulgating premium rates."

> "Art. 4910. The Commission (Board) may require sworn state-
> ments from any insurance company or association affected by
> this law showing the payroll reported to it and incurred
> losses by classifications and such other information which
> in the judgement of the Commission may be necessary in deter-
> mining proper classifications, rates and forms.  The Commis-
> sion shall prescribe the necessary forms for such statements
> and reports, having due regard to the methods and forms in
> use in other States for similar purpose in order that uni-
> formity of statistics may not be disturbed."

"Art. 4911. The Commission (Board) shall determine hazards by classes and fix such rates of premium applicable to the payroll in each of such classes as shall be adequate to the risks to which they apply and consistent with the maintenance of solvency and the creation of adequate reserves and a reasonable surplus, and for such purpose may adopt a system of schedule and experience rating in such manner as to take account of the peculiar hazard of each individual risk, provided such rate shall be fair and reasonable and not confiscatory as to any class of insurance carriers authorized by law to write workmen's compensation insurance in this State. To insure the adequacy and reasonableness of rates, the Commission shall take into consideration an experience gathered from a territory sufficiently broad to include the varying conditions of the industries in which the classifications are involved, and over a period sufficiently long to insure that the rates determined therefrom shall be just, reasonable and adequate rates. The Commission shall exchange information and experience data with the rate-making bodies of other States and shall consult any national organization or association now or hereafter existing for the purpose of assembling data for the making of compensation insurance rate."

"Art. 4912. Any policyholder, insurance company or association shall have the right to a hearing before the Commission on any grievance occasioned by the promulgation of any classification, rate or policy form by the Commission; such hearing to be held in conformity with rules to be prescribed by the Commission. No hearing shall suspend the operation of any classification, rate or policy form unless the Commission shall so order. Provided that any party aggrieved shall have the right to apply to any Court of competent jurisdiction to obtain redress. As amended Acts 1943, 48th Leg., p. 614, ch. 355, 1."

"Art. 4913. The Commission (Board) shall prescribe a uniform policy for workmen's compensation insurance and no company or association shall thereafter use any other form in writing workmen's compensation insurance in this State, provided that any company or association may use any form of endorsement appropriate to its plan of operation, if such enforsement shall be first submitted to and approved by the Commission, and any contract or agreement not written into the application and policy shall be void and of no effect and in violation of the provisions of this chapter, and shall be sufficient cause for revocation of license to write workmen's compensation insurance within this State."

"Art. 4914. Nothing in this chapter shall be constructed to prohibit the operation hereunder of any stock company, mutual company, reciprocal or inter-insurance exchange, or Lloyd's association, to prohibit any stock company, mutual company, reciprocal or inter-insurance exchange or Lloyd's association, issuing participating policies, provided no divident to subscribers under the Workmen's Compensation Act shall take effect until the same has been approved by the Commission. (Board). No such dividend shall be approved until adequate reserve has been provided, said reserves to be computed on the same basis for all classes of companies or associations operating under this chapter, as prescribed under the insurance laws of the State of Texas."

"Art. 4916. No provision of the Act creating the State Insurance Commission (Board) with regard to the fixing and promulgation of rates for fire insurance or the prescribing of fire insurance policies and forms shall be applicable to the fixing of compensation insurance classifications or the making of compensation insurance rates or the prescribing of compensation insurance policy forms; but the provisions of this Act shall be construed and applied independently of any other law or laws, or parts of laws, having to do with the matter of insurance rates and forms or of fixing the duties of the State Insurance Commission."

"Art. 4917. The words 'Company' and 'Association' used in this Act mean the Texas Employers Insurance Association, or any stock company, or any mutual company, or any reciprocal, or any inter-insurance exchange, or Lloyds association authorized to write Workmen's Compensation Insurance in this State."

The Board of Insurance Commissioners can exercise only the authority conferred upon it by law. Certain acts of the Board in excess of powers conferred are not official acts and it is not necessary that the exercise of the powers be negative in order to restrain the scope of their exercise. State vs. Robinson, 30 S.W. 2d, 292. While it appears the statutes conferring such authority will be strictly construed, Commercial Standard Ins. Co. vs. Board of Insurance Commissioners, 34 S.W. 2d, 345, 24 Texas Jurisprudence, paragraph 443,-this rule has been extended to those necessarily implied and such statutes and orders promulgated thereunder will be liberally construed to carry out the intent of the Legislature. Railroad Commission vs. High Underwriters, 124 S.W. 2d, 413; See Railway Commission of F. W. and D. C. Railway Company, et al, 161 S. W. 2d, 560. In passing upon such orders made by the Board of Insurance Commissioners to determine whether they are conferred under statutory or constitutional authority, the Courts will examine the language of the authority to see that it is free from doubt, and that it admits of no other reasonable interpretation. Humble

Oil and Refining Company vs. Railroad Commission, 128 S.W. 2d, 9, paragraph 5; that it is conferred in clear and unmistakable legislative terms, Board of Insurance Commissioners vs. Guardian Life Ins. Co. of Texas, et al, Vol. 12, Ray's Supreme Court Reporter, page 495; Scanlan vs. Home Insurance Company, 79 S.W. 2d, 186.

The law appears settled that applicable State laws and by-laws of such insurance corporations are read into every contract made on behalf of the corporation and neither the president not the Board of Directors of Insurance Corporations can exceed the limitations placed upon them by the laws effecting such corporations. Edwards vs. Keller, 133 S.W. 2d, 823. This rule, it seems, also applies to contracts of insurance issued by such corporations. Home Life Accident Insurance Company vs. Barron, 47 S.W. ad, 380; 29 Amer. Juris., Par. 178-180, p. 196 and 197. In Scanlen vs. Home Ins. Co., supra, the Court said:

> "The business of insurance is of public conqern and therefore subject to strict regulation and control by the State. Hence the rights of the parties to contract with respect to insurance are limited by the laws of the State which are a part of every contract. And any stipulation in an insurance policy which contravenes the statute is void."

In the light of the aforegoing authorities, we proceed to discuss the questions submitted. The first 7 questions read as follows:

> "1. Can any insurer place each subscriber in a separate group, regardless of hazards, such subscriber being the only subscriber in such group?
>
> "2. Can any insurer agree with a subscriber, oy way of resolution of its Board of Directors, or in any other manner, that such subscriber will pay to the insurer's certain percentage of the prescribed premium for administrative expense, without such agreement or resolution being made a part of the policy of insurance and approved by the Board of Insurance Commissioners?
>
> "3. Can any insurer agree with each subscriber that a certain percentage of the prescribed premiums may be used for the purpose of paying losses, and the saving to be returned to the subscriber?
>
> > a. As returned premium
> > b. As excess above expense and losses, or
> > c. As a dividend?

"4. Can any insurer return to its individual subscribers as dividends in proportion to its

    a. losses, or
    b. amount of premium paid?

"5. If you have answered in the affirmative any of the inquiries mentioned in Questions 3 or 4, than does such agreement have to be approved by the Board of Insurance Commissiomers before such agreement becomes legally operative?

"6. If you have answered in the negative any of the inquiries mentioned in Questions 3 and 4, then would the Board of Insurance Commissioners exceed its authority in approving such agreement?

"7. If you have answered that the Board of Insurance Commissioners would exceed its authority in approving such a plan as mentioned in Questions 3 and 4, then would such plan be illegal even though approved by the Board of Insurance Commissioners?"

In the memorandum and data submitted in connection with your request, it is disclosed that under the annual applications submitted to the Board on the part of certain insurers, for approval of dividend disbursements, certain applications disclosed no methods of making the disbursements nor do they contain any stipulations as to the manner of disbursement. Referring to Art. 8308 Sec. 13, of the Revised Civil Statutes of 1925, you point out that subscribers of the association are divided into groups and the examination of the records of the association reveals that all subscribers are not paid the same rate of dividend. You further point out instances have revealed only one subscriber comprising a "group". You also state that your examinations further reveal agreements relating to the percentages concerned in questions 2, 3 and 4, also involving questions 17 and 18, made by special resolutions, passed by the Board of Directors, subsequent to a previous resolution by the Directors of the Company, placing such subscribers in a particular group, and that it is found that these percentages vary and that a factor disclosed with reference to the association's general or largest group is that the varying dividends paid in this group is determined by loss ratios and size of premium paid.

Art. 8308, Sec. 13, R.C. S., 1925, provides:

"The board of directors may distribute the subscribers into groups for the purpose of segregating the experience of each such group as to premiums and losses, and for the purpose of determining dividends payable to and assessments payable

by the subscribers within each group, but for the purpose of
determining the solvency of the association, the funds of
the association shall be deemed one and indivisible.  The
board of directors shall have power to re-arrange any of
the groups by withdrawing any subscriber and transferring
him wholly or in part to any group and to set up new groups
at its discretion."

Generally speaking, any insurer authorized to write workmen's
compensation insurance in this state is authorized to distribute
and place its subscribers into groups for the purpose of segre-
gating the experience of each group as to premiums and losses.
Since the Act of 1923, Ch. 182 (including Articles 4907 through
4919), the Board of Insurance Commissioners has had imposed upon
it, the duty, among other things, to determine hazards by classes
and fix such rates of premiums applicable to the payroll in each
of such classes as shall be adequate to the risks to which they
apply.  In order to insure adequacy and reasonableness of rates,
the Board is required to take into consideration an experience
gathered from a territory sufficiently broad to include the vary-
ing conditions of the industries in which the classifications are
involved and over a period sufficiently long to insure that the
rates determined from such experience will be just, reasonable and
adequate.  In this connection, in so far as the rate making power
of the Board is concerned, having established and fixed a rate of
premium, the question arises as to whether there has been a dis-
regard of hazards in connection with any subscriber so grouped.

The word "hazard" is broad in meaning and scope.  It is generally
accepted as connotating "risk" and is so defined by Webster's
New International Dictionary.  The work hazard is not used in the
above Section 13 of Article 8308.  The Legislature used in the
word in the original workmen's compensation law, Acts of 1913,
33rd Leg., Ch. 179, wherein Part 3, Sec. 13, the Board of Direc-
tors of the "Texas Employers' Insurance Association", created
thereby, were permitted to distribute the subscribers into groups
"in accordance with the nature of the business and the degree of
hazard incident thereto."  It is significent to note that in Sec-
tion 16, following, the Act provided that all premiums, assessments
and dividends shall, by the Board of Directors, be fixed by and
for groups as above provided, "in accordance with the experience
of such group."

In 1917, the 35th Legislature, Chapter 103, amended the entire
1913 Act, and in Sec. 13, Part 3 of the 1917 Act, the words "in
accordance with the nature of the business and the 'degree of
hazard' incident thereto", were omitted and in lieu thereof the
following was inserted:

"For the purpose of segregating the experience of each such group as to premiums and losses, and for the purpose of determining dividends payable to and assessments payable by the subscribers within each group."

Section 16c was added in the Act of 1917, providing that the Board of Directors shall "determine hazards by classes, and fix the rates of premiums which shall be applicable to the payroll in each of such classes at the lowest possible rate consistent with the maintenance of solvency and the creation of adequate reserves and a reasonable surplus, and for such purpose may adopt the system of schedule and experience rating in such a manner as to take account of the peculiar hazard of each individual risk." Section 17 provided that any proposed rate of premium, assessment or dividend, or any distribution of subscribers shall not take effect until approved by the Commissioner. These sections of the 1917 Act, Sections 16c and 17, were repealed by the 1923 Act hereinabove mentioned.

It is apparent from the foregoing legislative history that the association or any other compensation carrier cannot segregate or classify assureds in accordance with the nature of their business or according to the degree of hazards. Such classifications for the purpose of grouping is inconsistent with the power vested solely in the Board and peculiarly confined and limited in use to the fixing of rates of premium.

Insurers and their subscribers, contract with each other with reference to anticipated losses. The hazards in connection with the operation or any portion of the operations of subscribers, are, as far as practical to be taken into account, considered exclusively by the Board in fixing the rate of premium and deemed acceptable to both insurers and subscribers at the time the contract is entered into.

Art. 8308, Sec. 13, supra, authorizes subscribers, as to their entire operations, or any part of the operations of each, to be distributed into groups by the insureds, for the purpose of segregating the experience of each such group as to premium and losses, and for the purpose of determining dividends payable to an assessments payable by the subscribers within each group. Segregating the experience of each group is to be distinguished from the classification of a subscriber according to hazards, wholly or in part. Every insurer engaged in writing Workmen's Compensation Insurance is prohibited from using any classification of hazards as a basis for setting up groups for segregating experience and paying dividends. Such is inconsistent with the provisions of Article 4908, supra.

It will be noted that Art. 8308, Sec. 20, provides the procedure for determination as a subscriber under his contract or policy on or before the date of its expiration. Present regulation, promulgated by the Board, (Texas Compensation Manual, page R12, effective March 1, 1943), provides that the compensation policy shall be written or issued for a term of one year. It is commonly recognized that policies expire and new ones are issued, necessitating the latter to be placed within certain groups in the event the assurer has adopted this plan of operation. While the subject or plan of grouping is not necessarily to be considered a proper subject for endorsement, there is no prohibition against its inclusion in an endorsement authorized by the Board of Directors of a company and attached to and made a part of the contract, where it is first submitted to and approved by the Board.

In Art. 8308, Sec. 13, the consideration by the insurer of the particular experience of certain subscribers or a group is permitted as well as limited to premium and losses. It is believed that the Legislature used the term _premium and losses_ as a unit as would prohibit the segregation solely on the basis of the premium paid or on the losses sustained, the first estimated and the latter anticipated. In other words, the statute is clear and unambiguous in designating the basis for permissible grouping, viz: the relation of premium to losses or the ratio between the two. This statute furthermore does not use the word _experience_ in a retroative sense, but it is used in a present sense and we can readily foresee the breakdown in the rates promulgated and dividends payable, resulting in discrimination, from any other interpretation of the statutes as a whole.

While the word "group" connotes more than one subscriber, and is defined by Webster as meaning two or more figures forming a design or taken together as a distinct unit in a more complicated design, it is not believed that the Legislature used the word in a limited or strict sense, but solely as a unit to distinguish that which is segregated, i. e., one group from another. One subscriber properly segregated may constitute one "group". See Hope vs. Flentge, 41 S.W. 1002, Words and Phrases, Vol. 18, Per. Ed. Page 780.

We can attach no significance to the fact that in Sec. 2, Art. 8309, R.C.S., 1925, Sec. 13, was not included as would expressly make that section applicable to other insurers, while certain other sections, such as 10, 17, 18a and 21 were specifically designated. The intention of the Legislature is expressed in controlling terms, to the effect that any insurance company, which term includes mutual and reciprocal companies, lawfully transacting a liability and accident business in this State "may have and exercise all the rights and powers conferred by this Act (Arts. 8306, 7,8, and 9, R.C.S., 1925, and as amended) on the association created hereby,"subject to a limitation imposed upon

mutual or reciprocal organizations requiring them to have at least 50 subscribers who have not less than 2,000 employees. We further point out that not only section 17 of the 1917 Act was repealed by the 1923 Act (Arts. 4907 through 4918, inclusive), but all other provisions of the 1917 Act inconsistent with the provisions of the 1923 Act were by it expressly repealed.

Answering the first five questions, in the order presented, it is the opinion of this department:

1. Any insurer may distribute a subscriber into a group to itself provided it is done so upon a reasonable loss ratio basis for segregating it from other groups.

2. An agreement made by any insurer with any subscriber concerning the prescribed premium, not attached to the policy of insurance and approved by the Board is void.

3. An agreement between any insurer and each subscriber providing that a certain percentage of the prescribed premium may be used for the purpose of paying losses, the saving to be returned to the subscriber, is not prohibited or illegal so long as same is incorporated in or made a part of the policy contract and does not discriminate between subscribers of the same class or group.

4. Any savings, excess or return premium as dividends can be returned to any subscriber on the basis of individual losses or amount of premium paid, provided in the payment of same, there is no discrimination between subscribers of the same class of group.

5. No agreement between insurers and their subscribers as referred to in question 3, or any return as dividends becomes legally operative or in effect until approved by the Board of Insurance Commissioners. The approval of a policy form endorsement does not constitute an approval of the dividends authorized to be distributed to the policy holders.

Answering questions 6 and 7, it is our opinion that where discrimination is disclosed under any plan for the payment of dividends, approval of same by the Board would be unauthorized. The fact that the Board ignored such discrimination and approved such dividends for payment would not affect the illegality of the plan.

Your questions number 8 through 11, specially relating to dividends, read as follows:

"8. Does the Board have authority to control dividends? If so, to what extent?"

"9. Does the Board have authority to approve dividends for each 'group' as referred to under Section 13 of Article 8309?"

"10. Does the Commission have the authority to require any insurer to submit the rate of dividend or formula used by groups or individual risks?"

"11. Can an insurer arbitrarily pay one percentage of dividend to one policyholder and a greater or lesser amount to other policyholders.?"

Art. 8308, Sec. 16, unchanged from its original enactment, expressly provides that dividends and assessments shall be fixed by and for groups and that the entire assets of the association shall be subject to the payment of any approved claim for compensation against the association. This provision of the statute is mandatory and is not inconsistent with the writing of participating or participation and assessment policy contracts on the part of certain insurers other than the Texas Employers. Here again we are reminded that the law is designed to operate uniformly as to all insurers. There is no prohibition against any insurer, whether it be Texas Employers, Insurance Association, a stock company, mutual, reciprocal or inter-insurance exchange or Lloyds, following the plan of grouping as authorized by Sec. 13, Art. 8308, supra. In fact, as to dividends, we may presume that certain participating policies written are by companies following this plan, with Art. 4914, supra, recognizing the right of said companies to issue participating policies, expressly providing that no such dividends shall be approved until adequate reserve has been provided, said reserves to be computed on the same basis for all classes of companies or associations operating under Chapter 10, Title 78, R.C.S., 1925, as prescribed under the insurance laws of the State of Texas.

One of the foremost and expressed duties commanded by law of the Board of Insurance Commissioners if to see that all laws respecting insurance and insurance companies are faithfully executed. Art. 4682, Subdivision subject dealt with in our laws respecting both insurance and insurance companies.

Art. 578, Penal Code, incorporated under Chapter 2, entitled "Insurance", in part, provides:

"No insurance company doing business in this State....nor shall any such company or agent thereof make any contract of insurance or agreements as to such contract other than as expressed in the policy issued thereon, nor shall any such company or any officer, agent, solicitor or representative thereof, pay, allow or give, or offer to pay, allow

or give, directly or indirectly as an inducement to insurance, any rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefits to accrue thereon or any paid employment or contract for service of any kind, or any valuable consideration or inducement whatever, not specified in the policy contract of insurance; or give, sell or purchase, or offer to give, sell or purchase, as an inducement to insurance or in connection therewith, any stocks, bonds or other securities of any insurance company or other corporation, association or partnership, or any dividends or profits to accrue thereon, or anything of value whatsoever not specified in the policy, or issue any policy containing any special or board contract or similar provision by the terms of which said policy will share or participate in any special fund derived from a tax or a charge against any portion of the premium on any other policy. Any officer or agent of such company violating any provision of this article shall be fined not less than one hundred nor more than five hundred dollars."

Article 580 of the Penal Code, also codified under the general subject of "Insurance", provides:

"Any officer or representative of any insurance company or association authorized to write workmen's compensation insurance in this State, who shall violate any provision of the laws relating to such business contained in chapter 10, Title "Insurance" of the Revised Statutes, relating to the State Insurance Commission and such business, shall be fined not less than one hundred nor more than five hundred dollars. Acts 1923, p. 411."

Construing the above articles of the Penal Code, they present a definite and fixed public policy on the part of the Legislature, which public policy is clearly defined and applicable to those engaged in writing workmen's compensation insurance in this State.

The making of any contract of insurance or agreement by any company or agent thereof, other than expressed in the policy; the allowing or giving or offering to pay, allow or give directly or indirectly as an inducement to insurance, any rebate or premium payable or any special favor or advantage in the dividends or other benefits or profits to accrue thereon, or paid employment or contract for service of any kind or any valuable consideration or inducement whatever, not specified in the policy; the issuance of any policy containing any special or Board contract or similar provision whereby the policy will share or participate in any special fund derived from a charge against the premium on any other policy; to knowingly write insurance at any lesser rate than the rate promulgated by the Board of Insurance Commissioners, all these and others relating principally to agents, are prohibited under

the foregoing statutes; and any company doing any of the acts prohibited is expressly deemed guilty of unjust discrimination.

In connection with the statutes declaring the public policy, it is material to note that a company sharing its profits with its policy holders by agreement as to profit sharing placed on or in the face of the policy, provided such is uniform and does not discriminate between individuals or between classes, is permitted. This expression of profit sharing is recognized in Art. 4914, R.C.S., 1925, which provides that nothing in Chapter 10 shall be construed to prohibit any stock company, mutual, reciprocal, inter-insurance exchange or Lloyd's Association, issuing participating policies, provided no dividend to subscribers under the Workmen's Compensation Act will take effect until the same has been approved by the Board of Insurance Commissioners.

Referring again to Art. 8308, Sec. 16, it requires dividends to subscribers to be fixed by and for groups where such grouping as herein discussed is followed by the insurer and Art. 4914 provides that no dividend to subscribers shall take effect until same has been approved by the Board. The act of approving payment of dividends is not to be construed as a mere formality on the part of the Board. It is charged with seeing that all insurance laws of the State are complied with and to this extent, proposed dividends should not only be disapproved, payment of which would result in insolvency of the insurer, but no dividend, whether it be called savings or otherwise, should be approved which discriminates between subscribers of the insurer or between members of groups into which they may be properly segregated.

Answering your questions 8,9,10 and 11, it is our opinion that the Board of Insurance Commissioners is authorized and required to approve dividends fixed by and for groups where such plan of operation is disclosed and followed by an insurer. Regardless of uniform endorsements disclosing the plan and approved by the Board, said Board may be regulation require all insurers electing to group its subscribers in accordance with Art. 8308, Sec. 13, R.C.S., 1925, to present to the Board its basis for payment of said dividends by groups at the time same are submitted for approval. No insurer can arbitrarily pay one percentage of dividend to one policy holder and a greater or lesser percentage to others.

Your questions, numbers 12 and 13, are too broad in scope and without sufficient definiteness and meaning for this department to give you any specific answer thereto. We therefore omit these questions and their consideration herefrom and request that you re-submit same seperately, specifically advising us of the type or types of agreement you refer to, or have in mind. Otherwise, we will consider that our answers to the other questions propounded by you render these questions of material importance to the Board.

Your question No. 14, reads:

> "Does 'Plan of Operation' as referred to in Art. 4913 mean
> the plan peculiar to a certain type of company; that is, a
> stock company, mutual company, reciprocal exchange or Lloyds
> organization, or does it mean that a carrier within any par-
> ticular type may use an individual plan of operation?"

We find no definition given in the statutes nor language particu-
larly limiting the meaning of "plan of operation" referred to.

Answering this question, therefore, it is our opinion that "plan
of operation" referred to in Art. 4913, R.C.S., means any plan
authorized by the laws of this State, and consistent with any
reasonable regulations of the Board which may be adopted and used
by any company or class of companies authorized to write Workmen's
Compensation Insurance.

Questions 15 and 16 contained in your request, read:

> "15. Can a stock insurance company legally issue a policy
> with an assessment provision against a policyholder?
>
> "16. Would a charter issued by the Secretary of State to a
> stock insurance company prior to the passage of the rating
> laws, authorizing such stock company to issue participating
> and assessment policies, and amendments approved by the
> Attorney General after the passage of the rating laws, permit
> such stock company to issue an assessment policy?

As hereinbefore stated, the law recognized the right of stock
companies to issue participating policies. Art. 4914, R.C.S., was
considered in an opinion of this department rendered to Hon.
J. J. Timmons, Secretary of State Insurance Commission by Hon-
orable R. B. Cousins, Jr., Assistant Attorney General, under date
of December 18, 1926, wherein he stated that the word partici-
pating in this connection includes the idea of participating in
losses as well as participation in profits. We further note that
this opinion passed specifically upon an endorsement form pro-
posed by a company operating under the Lloyds' plan, the provi-
sions of which would characterize the policy as one of partici-
pation and assessment.

A "participating policy" or one of "participating premiums" is
construed generally to mean one that is entitled to dividends or
which shares in all the profits arising from the premiums paid by
the insured. Words and Phrases, Vol. 31, Permanent Addition,
page 135. While the words "assessment" has varied meanings in
insurance parlance, and under the mutual plan may mean "premium"
or "dues", the statutes, charter, laws and contract have to be
looked to for determining the meaning of the term.

We know of no law, statutory or otherwise, that would authorize a stock company to issue strictly an assessment policy. While the act of sharing the profits may also include by contract, the idea of sharing the losses, it does not necessarily mean that one who shares in the profits, independent of contract, will share in the losses, nor does it necessarily mean an additional premium rate in violation of the rate making powers of the Board is contracted for.

Where a stock company writing Workmen's Compensation Insurance Policies, on a participating or profit-sharing basis, incorporates an assessment provision in its contract, it is presumed to be operating under the mutual plan for writing such insurance. There is no statutory prohibition against a stock company operating under such plan. Nothing contained in the charter or by-laws of a stock company, however, can authorize it to write strictly assessment policies or policies containing any assessment provision without likewise providing for participation on the part of the subscriber. The rule appears applicable as applied to strictly mutual companies to the effect that any regulation of such matters by its charter or by-laws must be consistent with express statutory provisions, mandatory or prohibitory in nature.

As to the above questions, Nos. 15 and 16, it is our opinion that same be and they are each answered in the negative.

Questions 17, 18, and 19, read:

"17. Can any insurer issue a 'stop-loss' contract; that is, a contract guaranteeing that the maximum premium will be a lesser amount than the premium produced at rates prescribed by the Board?

"18. Can any insurer agree, by resolution of its Board of Directors, or in any other manner, to cause a 'stop-loss' contract to be issued by any other insurer licensed to do business in this State, without such agreement being made a part of the policy contract and approved by the Board of Insurance Commissioners?

"19. Can any insurer licensed to do business in this State issue a 'stop-loss' contract guaranteeing that the maximum premium will be a lesser amount than the premium promulgated by the Board of Insurance Commissioners on policies of workmen's compensation issued by another insurer?"

You point out that the "stop-loss" plans in use in Texas, while differing in detail, the principles are essentially the same. That they embody the "cost-plus" plans and in addition purport to protect the employer against losses in excess of 100% of the standard premium.

The principle of "cost-plus" is described by you as an agreement between the carrier and employer that a certain percentage of the premium is to be paid to the carrier for "expenses", and the losses are paid out of the remainder of the premium. Further, you conclude that if the employer can prevent losses, he saves money because he does not pay all of the premium, and if the losses exceed the premium, the employer must pay them, or if the carrier has undertaken payment, reimburse the carrier. In other words, you submit the view that the employer pays all losses and in addition pays the carrier for expenses.

From the above views, we are unable to hold that such a contract, presumed to be incorporated as a part of the policy by endorsement, issued by the carrier to all employers alike, without discrimination, contravenes the rate making power of the Board. In short, it is nothing more than a participating form policy whereby the parties, subject to the provisions of the law, read into every policy contract with reference to the experience or the anticipated loss ratio of the employer or group into which he is properly placed. The percentage as to "expense" cannot vary between subscribers of the same class or group, nor can it in anywise affect or bind the Board as to the reserve required or dividends authorized to be paid. Any return of premium or savings are subject to approval of the Board as in payment of dividends.

In answer to questions Nos. 17, 18, and 19, it is our opinion that no insurer writing Workmen's Compensation Insurance in this State can contract with the subscriber by guaranteeing that the maximum premium will be a lesser amount that the premium produced at rates prescribed and promulgated by the Board. The character of such agreements from the description furnished and termed "stop-loss" contracts do not amount to such guarantee. The matter of reinsurance is purely a matter of contract between the carrier and its reinsuring company for the protection of its reserves and surpluses and while there is no prohibition against its being incorporated in the particular endorsement adopted by the company, to be uniformly done without discrimination, such endorsement should be attached to all standard form policies of such insurers.

With reference to your question No. 20, it is not shown that such appointment is incorporated in any endorsement to the standard policy approved or before you for approval. We cannot assume the same participating endorsement attached to all policies from your Question No. 21, and should we do so, we are not furnished sufficient facts from which it can be determined whether a proper grouping of subscribers will permit the distinction pointed out. These questions are placed in the same category along with your Question No. 12 and 13. It has long been the practice of the Insurance Department to submit particular endorsements proposed to be adopted by the insurer to this department where any question of

the Board are raised by you.  We therefore, omit sai d questions from this opinion, subject to resubmission, if desired, in accordance herewith.

Your last question, No. 22, reads as follows:

"22. If a workmen's compensation insurance policy written on a so-called 'cost-plus' plan, is insurance <u>insofar as the employee is concerned</u> under the Act, in accordance with the Gomillion vs. Union Bridge decision 100 Fed. (2) 937, is the net premium realized by the insurance company (that is, the gross premium less the amount returned to the assured under such 'cost-plus' plan) legal premium and authorized by the Workmen's Compensation Insurance Rating Law?"

In the Gomillion vs. Union Bridge case, referred to, the court had before it apparently the identical participation form endorsement as presented in "Exhibit C" attached to your request.  The material provisions of this endorsement read:

".....It is agreed between the Company and the Assured that:

"(1) The Assured will pay the Company the manual or experience rates of premium applicable to this policy, as promulgated by the Board of Insurance Commissioners of Texas.

"(2) If the premium so paid are insufficient to provide for the payment of

(a) All paid and incurred losses, including legal and other expenses incidental thereto arising under this policy; and

(b) Such per cent of all premiums as may be agreed upon between the Assured and the Company, which per cent shall be retained by the Company;

the Assured will pay to the Company, upon demand, such additional amounts as may be necessary to provide adequate reserves computed as prescribed by the Board of Insurance Commissioners under the insurance laws of the State of Texas.

"(3) If the premiums so paid shall prove to be more than sufficient to so provide for the payment of the charges mentioned in the preceding sub-paragraphs (a) and (b) of paragraph 2 hereof, and the maintenance of adequate reserves computed on all policies as stated in paragraph 2 hereof, the Company will return the excess to the Assured as and when such return shall be approved by the Board of Insurance Commissioners of Texas."

In the Gomillion case involving a suit by the beneficiaries of a fatally injured employee against his employer for damages, the employer defended on the ground that it was a subscriber under the Workmen's Compensation Insurance Act. Answering this contention, the beneficiaries, appellants,contended no risk was assumed under the policy and that the employer was a self-insurer.

The court apparently followed the weight of decisions which appear to be in favor of the Commission of Insurance or Board being invested with the power to determine whether or not policy forms conform to requirements under statutes requiring approval of such forms by the Commissioner or Board.  All American Benevolent Society vs. Erickson, 3 N. W. 2d, 821; Aetna Life Ins. Co., vs. Hardison, 85 N. E. 407; 29 Amer. Juris. page 63, note 19.

It has further been held that the approval of a life policy form involves an administrative ruling that such form met affirmatively every requirement of the statutes prescribing its provisions. Manhattan Life Ins. Co., New York, vs. Wilson Motor Co., Inc., 75 S.W. 2d, 721

Under paragraph (3) of the above endorsement form, which apparently is the participating feature, the company agrees to return the excess "as and when such returns shall be approved by the Board of Insurance Commissioners of Texas."  Carrying this provision to a most favorable result, if the subscriber incurred no losses or expense, the insurer has contracted to return, subject to the approval of the Board, 90% of its gross premium or a 90% dividend subject to the approval of the Board.  We see no conflict in this provision with the rating statutes above referred to, presuming adequate reserves are maintained as required by law.  We are not to be understood, however, as approving such endorsement form, a matter we do not consider necessary in order to answer the above question.

It is therefore our opinion that the net premium realized from the participating clause (3) of the enforsement form involved in the case of Gomillian vs. Union Bridge, 100 Fed. Sec. 937, whether to be considered premium or otherwise, is authorized and not in conflict with the Workmen's Compensation Insurance Rating Law.

In conclusion, we wish to state that among others, we have reviewed the following opinions of this department, submitted along with your request:

1. Exhibit "D" to Hon. J. J. Timmons, Secretary State Insurance Commission, 12/18/26

2. Exhibit "E" to Hon. W. S. Pope, Casualty Insurance Commissioner, 2/23/32

3. Exhibit "F" to Hon. R. G. Waters, Casualty Insurance Commissioner, 6/24/35

5. Exhibit "H" to Hon. R. G. Waters, Casualty Insurance Commissioner 9/28/38

6. Exhibit "I" to Hon. R. G. Waters, Casualty Insurance Commissioner 12/16/38

In so far as the foregoing opinions, or portions of them, hold adversely to our answers given or in any wise conflict herewith, same are expressly overruled. We expressly overrule that portion of the opinion, Exhibit "H", rendered to Hon. R. G. Waters, Casualty Insurance Commissioner, under date of September 28, 1938, by Hon. Richard Brooks, Assistant Attorney General, in answer to the seventh question propounded therein.

No portion of this opinion is to be construed or interpreted as passing upon, upholding or disapproving any endorsement form or or plan of operation referred to in your memorandum, exhibits or opinions submitted in connection with this request. The only specific plan of operation which could be construed sufficiently submitted for such purposes is that of the Texas Indemnity Insurance Company with its present endorsement form, according to your letter, set forth as Exhibit "C" attached. In view of the fact that your questions individually and in the main relate solely to specific phases of this or similar plans, without expressly requesting our review of the particular endorsement form or plan of any company, we deem it advisable to so limit this opinion as above stated.

We are returning herewith the data and exhibits belonging to your files which were furnished in connection with your letter. We desire to express our appreciation for the able assistance given by Mr. Vestal Lemmon, Actuary, who generously conferred with us from time to time at our request.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By    Wm. J. R. King
      Assistant

WJRK:rt
Encls.

APPROVED: Oct. 4, 1944
      Carlos Ashley
      First Assistant